IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| KCI Management Corp. et al., | ) | |
| | ) | |
| | ) | C.A. #2:03-1633-23 |
| Plaintiff, | ) | **ORDER** |
| v. | ) | |
| Posternak, Blankenstein & Lund, | ) | |
| LLP, et al., | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court upon two motions filed by Defendants: (1) Defendants'
renewed Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2), or Alternatively for Summary
Judgment; and (2) Defendants' Motion to Strike and/or Exclude certain of Plaintiffs' witnesses and
testimony.  For the reasons set forth herein, Defendants' renewed motion to dismiss for lack of
personal jurisdiction is denied, and Defendants' alternative request for summary judgment is
granted.  Defendants' Motion to Strike and/or Exclude Certain of Plaintiffs' Witnesses and
Testimony is rendered moot.

## BACKGROUND

KCI Management Corporation ("KCI") and Alexis Kisteneff ("Kisteneff") (collectively,
"Plaintiffs") brought this action against Posternak, Blankstein & Lund, LLP ("the Law Firm"),
David M. Saltiel ("Saltiel"), and James Lyle ("Lyle") (collectively, "Defendants") for legal
malpractice, breach of contract, fraud, negligent misrepresentation, breach of the implied covenant
of good faith and fair dealing, breach of fiduciary duty, civil RICO, and violation of South Carolina
Unfair Trade Practices Act.  Kisteneff is the sole stockholder of KCI, a real estate development and
property management corporation; both Plaintiffs are South Carolina residents.  The Law Firm,
Saltiel, and Lyle are residents of Massachusetts.

The action arises out of the parties' attorney-client relationship, which began in 1995.  The

initial object of the attorney-client relationship was to aid KCI in acquiring and developing real estate in the Northeast.  At some point in 1995, through Saltiel's connections, Plaintiffs were introduced to Malcolm Post ("Post"), who was a developer of residential properties and a friend of Saltiel.  The parties began searching for acquisition properties, and Defendants provided legal services to Plaintiffs relating to the formation of a real estate venture, WAGA Investment Associates, L.P., in which Kistensteff and Post intended to act as partners.  When WAGA was not successfully formed, Defendants assisted Plaintiffs in forming a new venture, ALMA, which was to be a South Carolina corporation.  Like WAGA, the ALMA entity was also never successfully formed.[1]

In 1995, KCI identified property in Boston, Massachusetts known as Hyde Park for possible purchase and development, and retained the Law Firm to assist with this project.  After extensive permitting activity with the City of Boston, the Hyde Park project was approved for development.[2] In January 1996, Post, as Vice President of KCI, signed a Memorandum to purchase approximately 38 acres in West Cranston, Rhode Island, which was being sold by Cove Road Development Company ("Cove Road").  (Defs. Ex. 19.)[3]  A year later, in January of 1997, Post submitted an

---

[1]  During these dealings, Post apparently became a Vice President of KCI Management. (Def. Ex. 5).

[2]  KCI ultimately sold the Hyde Park development for $1.75 million dollars.  The Law Firm contends that KCI fraudulently failed to pay its fees and costs in connection with the project despite this massive profit.  More specifically, the Law Firm contends that KCI pledged to not transfer Hyde Park to the buyer without putting an amount in escrow to cover the legal fees, but fraudulently failed to do so.  The Law Firm alleges that it did not learn of the Hyde Park sale until 2003, whereupon KCI filed the present lawsuit to preempt a collection action.  The Law Firm has filed a collection action in Superior Court in Massachusetts.

[3]  Defendants contend that the Law Firm was not involved in drafting the Memorandum of Purchase and Sale for this property.  (Defs. Mem. at 7).

Amendment to the Memorandum, which the sellers rejected.  (Def. Ex. 21).  On January 8, 1997, the seller advised Post that he was pursuing other buyers.  (Def. Ex. 23).  Post consulted with Defendant Lyle at this point to ascertain whether the Memorandum was enforceable.  Lyle informed Post that the Memorandum was likely unenforceable because it had not been supported by earnest money, and lacked a closing date.  In any event, Lyle notarized Post's signature on the document and sent it for recording in an effort to give the Memorandum some appearance of validity.  (Lyle Dep. at 95-96).

In or around February 1997, the Law Firm, through Defendant Lyle, began negotiating for the acquisition of the Rhode Island property on behalf of Post, without regard to KCI or Kisteneff. Defendants also assisted Post in forming a new partnership with Paul and Jeffrey Rothstein ("the Rothsteins") for the purpose of purchasing this property.[4]  Ultimately, these negotiations were successful, and Post's new partnership acquired the Rhode Island property.[5]  Plaintiffs were not included in the negotiations or the acquisition of this property.  In this case, Plaintiffs allege that Defendants operated under a conflict of interest by representing Post in matters that were directly adverse to Plaintiffs' interests.  Plaintiffs further contend that Defendants breached fiduciary duties and acted negligently and fraudulently throughout the course of their representation of Plaintiffs, from 1995 until 2002.

---

[4]  Notably, the Post/Kisteneff relationship had soured in December of 1996 when KCI refused to continue making monthly payments to Post, and when Kisteneff disagreed with Post's handling of permitting issues on the Hyde Park development.  In June of 1998, KCI sued Post in South Carolina state court.  In October of 1998, Post instigated his own action against KCI and Kisteneff in Massachusetts.  The Law Firm was not involved in either of these suits.

[5]  After the purchase, the development never succeeded.  Post died of cancer in October of 1999, and shortly thereafter, the project went into receivership.

3

## ANALYSIS

**I.    Defendants' Renewed Motion to Dismiss for Lack of Personal Jurisdiction**

After removing the case to this court, on May 7, 2003, Defendants moved to dismiss for lack of personal jurisdiction.  The court denied that motion on the grounds that Defendants had maintained an ongoing relationship with South Carolina clients and thus had purposefully directed their activities toward this state.  (Order of August 25, 2003).  Defendants now contend that an affidavit submitted by Kisteneff in 2003 - upon which the court relied in its earlier ruling - contained false facts.  According to Defendants, "this Court's earlier ruling on jurisdiction, made before discovery and based only on the Complaint and Kisteneff's false affidavit, must now be reversed." (Defs. Mem. at 14).

When personal jurisdiction is challenged by the defendant, the plaintiff has the burden of showing that jurisdiction exists.  *See In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997).  When the court decides a pretrial personal jurisdiction dismissal motion without an evidentiary hearing, the plaintiff needs only prove a prima facie case of personal jurisdiction.  *Combs v. Bakker*, 886 F.2d 673, 675 (4th Cir. 1989).  In making this determination, the court looks to the complaint and any supporting affidavits.  *See In re Celotex Corp.*, 124 F.3d at 628.  Further, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction."  *Combs,* 886 F.2d at 676.

To validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied.  *See Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001).  First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and second, the exercise of personal jurisdiction must not "overstep the bounds"

4

of Fourteenth Amendment due process. *See Anita's New Mexico Style Mexican Food, Inc. v. Anita's Mexican Foods Corp.*, 201 F.3d 314, 317 (4th Cir. 2000). South Carolina's long-arm statute has been construed to extend to the outer limits allowed by the Due Process Clause. *Foster v. Arletty 3 Sarl*, 278 F.3d 409, 414 (4th Cir. 2002). "Consequently, the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *ESAB Group, Inc. v. Centricut, Inc.*, 26 F.3d 617, 623 (4th Cir. 1997) (internal quotation marks omitted).

The question, then, is whether Defendants have sufficient "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citations omitted). The Fourth Circuit has applied a three-part test when evaluating the propriety of exercising specific jurisdiction:[6] (1) whether and to what extent the defendant "purposely availed" itself of the privileges of conducting activities in the forum state, and thus invoked the benefits and protections of its laws; (2) whether the plaintiff's claim arises out of those forum-related activities; and (3) whether the exercise of jurisdiction is constitutionally "reasonable." *Nolan*, 259 F.3d at 215-16 (citing *Helicopteros*, 466 U.S. at 415-16, and *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 476-77 (1988).

### A.     Purposeful Availment

Defendants renew their argument that they did not purposefully avail themselves of the

---

[6] Plaintiff does not appear to argue that the court possesses general jurisdiction over Peerless. Accordingly, the court only considers whether specific jurisdiction exists.

5

privilege of doing business in South Carolina because(1) they did not solicit KCI's[7] work or initiate contact with it, (2) all of Defendants' work on behalf of KCI was performed in Massachusetts; and (3) none of the Defendants ever traveled to South Carolina in the course of their representation, none own property in South Carolina, and none have solicited or advertised for business in South Carolina.  (Defs. Mem. at 15).  While these arguments largely rehash those made to the court in 2003, Defendants additionally take issue with several assertions in Kisteneff's 2003 affidavit. Specifically, Defendants challenge the following facts: (1) Kisteneff's assertion that  KCI received and paid numerous bills from Defendants for legal work done in relation to property in Greenville, South Carolina; (2) Kisteneff's claim that the Law Firm assisted with the acquisition of three other properties in South Carolina; and (3) Kisteneff's contention that the Law Firm worked for KCI in forming ALMA.  (Def. Mem. at 12).  According to Defendants, after the benefit of full discovery, it is clear that Kisteneff's assertions are false in that the Law Firm did not represent KCI concerning any South Carolina property, and only assisted Post, not Kisteneff or KCI, for work related to ALMA.  *Id.*

        In its Order of August 25, 2003, the court held

        In the present case, Defendants purposely availed themselves of the privilege of
        doing business in the forum state of South Carolina by virtue of their ongoing
        attorney-client relationship with Plaintiffs, both South Carolina residents. While the
        bare existence of an attorney-client relationship is insufficient contact to subject the
        attorney to jurisdiction in the client's state, an attorney who maintains an ongoing
        relationship with the client purposefully directs his activities toward the forum state
        so that litigation there is foreseeable and jurisdiction is consistent with due process.
        *See Burger King*, 471 U.S. at 479-80; *Hanson v. Denckla*, 357 U.S. 235, 253 (1958);

_____

[7]  To the extent that Defendants argue that they never undertook representation of Kisteneff, but only represented KCI, the court disagrees.  As Plaintiffs point out, the Law Firm blurred any distinction between these two clients by billing and performing work for them interchangeably. *See, generally,* Saltiel Dep.

*Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 259 (11th Cir. 1996) (finding personal jurisdiction in Florida courts over Michigan attorneys where non-resident attorneys undertook representation of Florida resident); *Klump v. Duffus*, 71 F.3d 1368, 1372 (7th Cir. 1995) (concluding that North Carolina lawyer retained to represent an Illinois resident in an Illinois lawsuit had purposefully directed his activities toward Illinois); *Trinity Indus., Inc. v. Myers & Assocs.*, 41 F.3d 229, 230 & n.6, 231 (5th Cir. 1995) (holding personal jurisdiction was proper in Texas over an Illinois law firm; representation of the Texas client in more than forty matters, including a court appearance in Texas, indicated purposeful availment of the privileges of doing business in Texas); *Keefe v. Kirschenbaum & Kirschenbaum PC*, 40 P.3d 1267 (Colo. 2002) (en banc) (holding personal jurisdiction was proper in Colorado over a New York law firm because lawyer "consciously entered into the agreement, with foreseeable consequences" to represent resident of Colorado). Here, Defendants maintained an ongoing attorney-client relationship with Plaintiffs for approximately 7 years, they represented Plaintiffs in various matters, including the development of property in South Carolina, and they made contact with Plaintiffs in South Carolina on numerous occasions, through letters, telephone calls, faxes, bills for payment for legal services rendered, and other communications. (Kistensteff Aff. at ¶ 16.) These contacts with South Carolina were purposeful and repeated; they were not "random, fortuitous, or attenuated." *Burger King Corp.*, 471 U.S. at 475; *Robinson*, 74 F.3d at 259 ("The defendants are not being haled into a Florida court as the result of any random, fortuitous, or attenuated contacts, or because of any unilateral activity by the Decedent. The nature of the professional services rendered in this case was such that the defendants were fully aware that their actions or omissions would have a substantial effect in Florida.").

Indeed, the Fourth Circuit has held that the "purposeful availment" prong was satisfied on facts similar to the ones alleged here. *See English & Smith v. Metzger*, 901 F.2d 36, 39-40 (4th Cir. 1990). In *English & Smith*, the Fourth Circuit held that Virginia could properly assert personal jurisdiction over a California attorney (Metzger) who hired a Virginia attorney (Smith) to do legal work. Among other things, the court found it significant that Metzger carried on a continuing relationship with Smith in Virginia while the two worked on legal matters. *Id.* The court also noted that Metzger made several phone calls and mailings into the forum state. Likewise, in *Hirschkop & Grad, P.C. v. Robinson*, 757 F.2d 1499 (4th Cir. 1985), the Fourth Circuit upheld jurisdiction over a Virginia law firm's out-of-state client. The client's contacts with the firm included telephone conferences, two years of legal representation, correspondence, and payments to the firm in Virginia. *Id.* at 1503. The client also made two brief personal visits to Virginia, but the Fourth Circuit's decision did not rely on the visits; rather, it focused on the contacts "considered together." *Id.* at 1503.

(Order of August 25, 2003 at 5-6) (internal citations omitted).

The court is unpersuaded that its earlier decision should be reconsidered for one primary

reason - Plaintiffs' version of the facts still supports the court's earlier reasoning. That is, according

to Plaintiffs,

> [T]he purposeful or minimum contacts supporting . . . jurisdiction include [1]
> communications with Plaintiffs by mail and telephone, which . . . is not disputed, [2]
> advising Plaintiffs as to various legal matters, [3] advising Plaintiffs and their agent,
> Malcolm Post, regarding numerous land transactions (including providing advice in
> connection with an option to purchase land in Greenville, South Carolina), [4]
> working toward the formation of ALMA, a proposed South Carolina corporation, [5]
> requesting and receiving authorization for various legal actions, and [6] demanding
> and receiving payments from these South Carolina clients.

(Pl. Resp. at 6-7). Contrary to Defendants' arguments, the facts can at least plausibly be read to

suggest that all of these actions occurred. *See* Saltiel Dep. at 28-30,[8] 32-33; Kisteneff Dep. (2004)

at 133-34, 155. As noted above, the court is bound to construe the facts in Plaintiffs' favor for

purposes of this motion.[9]  *See, e.g., Meier ex. Rel. Meier v. Sun Intern. Hotels, Ltd.,* 288 F.3d 1264,

---

[8] For example, Saltiel states that he assisted in the formation of ALMA, a proposed South
Carolina entity, by "viewing documents forwarded to us . . . and negotiating those and other
documents that were prepared." (Saltiel Dep. at 28). When asked who should pay the invoices for
work related to the formation of ALMA, Saltiel answers that KCI and Post are responsible:

| | |
|---|---|
| Q: | If the entity (WAGA) never came to be, who was to pay those invoices? |
| A: | The persons who engaged me, both. |
| Q: | Was that entity formed? |
| A: | Depends on what you mean by formed. Which entity are we talking about first? |
| Q: | Either Alma or WAGA? |
| A: | I don't believe the documents were ever prepared in connection with WAGA. And no documents were ever signed in connection with ALMA. |
| Q: | So who is responsible for that invoice? |
| A: | I believe KCI and Mr. Post. |

*Id.* at 30. While it may be true that Kisteneff has disputed whether this work was done for him or
for Post, and Defendants now contend that the work was performed solely for Post, this does not
change the fact that Saltiel believed he was assisting South Carolina residents (both Post and KCI)
in the formation of a South Carolina entity, and still believes KCI, a South Carolina entity, is
responsible for payment to him.

[9] Moreover, "[t]he burden plaintiff bears to establish the court's jurisdiction normally is not
a heavy one, particularly where the court chooses to rule on the issue without an evidentiary
hearing." *Clark v. Milam,* 830 F.Supp. 316, 319 (S.D. W. Va. 1993).

1269 (11th Cir. 2002) ("Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff."); *Ticketmaster-New York, Inc. v. Alioto,* 26 F.3d 201, 203 (1st Cir. 1994) (on a motion to dismiss, the court is charged with "taking facts affirmatively alleged by plaintiff as true and construing disputed facts in the light most hospitable to plaintiff."); *Precept Med. Products, Inc., v. Klus,* 282 F.Supp. 2d 381, 385 (W.D.N.C. 2003) ("for the purposes of a Rule 12 (b)(2) motion, the Court will accept the Plaintiff's version of disputed facts").  Construing the facts in the light most favorable to Plaintiffs (and as the court concluded in its earlier Order), Defendants willfully had regular contact with Plaintiffs, knowing they were South Carolina residents, directed much correspondence to Plaintiffs in South Carolina, and attempted to form a South Carolina entity which Plaintiffs were billed for.[10]  Accordingly, the court's earlier conclusion that Defendants are properly subject to personal jurisdiction on the basis of their ongoing relationship with residents of this forum remains correct.[11]  *See, e.g., Burger King,* 471 U.S. at 473 (holding that a party that creates "continuing relationships and obligations with citizens of another state is conducting activities within the forum

---

[10]  While Defendants' renewed motion challenges specific facts that occurred during the parties' ongoing relationship, Defendants' "new" evidence does not in any way contradict the existence of that ongoing business relationship.  As discussed above, the ongoing business relationship between the parties was the driving force behind the court's earlier ruling.

[11]  Defendants cite *Austad Co. v. Pennie & Edmonds,* 823 F.2d 223 (8th Cir. 1987) and *Sher v. Johnson,* 911 F.2d 1357 (9th Cir. 1990) for the proposition that providing out of state legal representation is not enough to subject an out of state lawyer or firm to personal jurisdiction in the client's home state.  The court finds these cases distinguishable for several reasons.  First, construing the facts in Plaintiffs' favor, at least some of Defendants' representation concerned in-state affairs.  *See, e.g.,* Saltiel Dep. at 28-30.  Moreover, as at least one other district court has noted, in "each of the cases Defendants cite, the law firms were retained for representation in a single legal matter in the law firm's state.  The relationships between the attorneys and clients were, as the *Sher* court termed them, 'one-shot' deals."  *Clark,* 830 F.Supp. at 323 n. 10.  Here, in contrast, the parties had an ongoing relationship that stemmed from 1999 - 2003.

state" is conducting activities within the forum state, and consequently, "is subject to regulation and sanctions in the other State for the consequences of [its] activities."); *Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998) (holding that if a "nonresident defendant transacts business by negotiating and executing a contract via telephone calls and letters to [an] Ohio resident, then the defendant has purposefully availed himself of the forum by creating a continuing obligation in Ohio"); *Heritage House Rests., Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276, 281, 284 (7th Cir.1990) (telephone contacts establishing an ongoing business relationship in forum state may support personal jurisdiction); *Clark,* 830 F.Supp. at 323 ("By maintaining a continuing professional relationship with a West Virginia corporation that repeatedly called upon her to represent it both within and without the State, Defendant Lamm purposely availed herself of the privilege of conducting activities in West Virginia.").

**B.     Whether Plaintiffs' Claims Arise Out of Forum-Related Activities, and The Reasonableness of Exercising Jurisdiction**

The court similarly rejects Defendants' attempt to re-litigate the questions of whether Plaintiffs' claims arise out of forum-related activities and whether exercising jurisdiction is constitutionally reasonable.  Nothing that Defendants have obtained in discovery militates in favor of disturbing the prior ruling, in which Defendants made largely the same arguments they raise now - that "[t]he gravamen of Plaintiffs' Complaint is an alleged lost opportunity to purchase property in Cranston, Rhode Island," and that the contacts relied upon by Plaintiffs are irrelevant to this claim.  (Order of August 25, 2003 at 8-9).  As the court stated then, "[a]lthough it is true that Plaintiffs' alleged damages are due, in large part, to Defendants' conduct with respect to the Rhode Island transaction, the allegations forming the basis of this lawsuit arise out of Defendants' contacts

10

with South Carolina." *Id.*[12]  Accordingly, the court denies Defendants' renewed motion to dismiss without further discussion, and finds the exercise of jurisdiction to comport with due process and the notions of fair play and substantial justice for the reasons outlined in the court's Order of August 25, 2003.[13]

## II.     Defendants' Motion for Summary Judgment

Defendants alternatively argue that, should the court decide it does possess jurisdiction, they are entitled to summary judgment on all of Plaintiffs' claims.  Defendants contend that (1) the applicable statutes of limitations bar all of the eight causes of action; (2) Plaintiffs' RICO claim fails because Plaintiffs cannot prove racketeering activity or pattern; (3) Plaintiffs cannot prove the

---

[12]  Defendants appear to contend that the court erroneously analogized this case to *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999), in which the Fifth Circuit stated:

> [W]hen a lawyer chooses to represent a client in another forum, that in itself does not confer personal jurisdiction if the claim does not arise from the lawyer's contacts with the forum.  However, when the claim arises from a breach of fiduciary duty based on a failure to disclose material information, the fact that the lawyer continually communicated with the forum while steadfastly failing to disclose material information shows the purposeful direction of material omissions to the forum state.

According to Defendants, that case is distinguishable for a number of reasons, including the fact that in *Brandt,* the plaintiff's allegations concerned misappropriation of property and money in the forum state.  Rather, according to Defendants, "the Complaint centers on alleged misrepresentations concerning the Rhode Island property."  First, the court disagrees with Defendants' characterization of the Complaint, which alleges causes of action related to the Rhode Island property, but more broadly to alleged breaches of duty and contract in connection with the parties' eight year relationship.  Moreover, Defendants' attempt to distinguish *Brandt* on the basis that *Brandt* only applies when misappropriations of property and money in the forum state occur is unconvincing. The gravamen of the claims in *Brandt* - breach of contract and breach of fiduciary duty in failing to disclose material information - is the same as Plaintiffs' claims in the matter *sub judice*.  Both involve tortious conduct directed at the forum state, and the physical location of any alleged breach of duty or misappropriation is irrelevant in determining whether the Plaintiffs' claims arise out of forum-related activities.

[13]  The court incorporates the reasoning of that Order without a further recitation.

necessary elements of their SCUTPA claim; and (4) Plaintiffs cannot prove the elements of its

malpractice claims because they have no expert testimony to prove a breach of the standard of care,

cannot show damages proximately caused by Defendants' actions, and have no cognizable damages

as a matter of law.  As a threshold matter, the parties dispute whether the substantive law of

Massachusetts or South Carolina applies.  The court begins its analysis by considering the choice

of law question, and then turns to the merits of Defendants' arguments.  Finding that the discovery

rule bars all of Plaintiffs' claims, the court ends its analysis without reaching Defendants' arguments

on the merits of Plaintiffs' causes of action.

### A.     Choice of Law

In a diversity case, a federal court must apply the choice of law rules of the state in which

it is located.  *See Klaxton Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *see also Spartan*

*Iron & Metal Corp. v. Liberty Ins. Corp.*, 6 Fed. Appx. 176 (4th Cir. 2001); *Thorton v. Cessna*

*Aircraft Co.,* 886 F.2d 85, 87 (4th Cir. 1989).  Under South Carolina choice of law principles, the

"substantive law governing a tort action is determined by the state in which the injury occurred."[14]

*See Lister v. NationsBank*, 494 S.E.2d 449, 454 (S.C. Ct.App. 1998); *see also Dawkins v. State,* 412

S.E. 2d 407, 408 (S.C. 1991) ("It is well established in South Carolina that in tort cases the law of

the place where the injury was occasioned or inflicted governs in respect of the right of action, and

---

[14] The court notes that Plaintiffs' complaint alleges a cause of action for breach of contract.
The parties have not raised arguments in regards to what state's substantive law would apply to this
cause of action.  The court notes, however, that a different rule would apply to determining the law
to apply to a contract claim versus a tort claim.  *See, e.g., Joye v. Heuer,* 813 F.Supp. 1171
(D.S.C.1993) (under South Carolina choice of law rule, law of place where contract is made governs
contract); *Dawkins v. State,* 412 S.E. 2d 407, 408 (noting that in tort cases, the situs of the injury
determines what law applies).  In any event, this distinction is without relevance, as the court does
not reach the merits of any of the causes of action as discussed below.

the law of the forum in respect to matters pertaining to the remedy only.") (internal citations omitted). The parties agree that this is the applicable standard, but disagree as to the application of this standard to the matter *sub judice*.

> Defendants argue that Massachusetts law applies here because
>
> KCI engaged Defendants' services in Massachusetts. All legal work performed by Defendants was performed at their office in Boston, Massachusetts. All alleged acts took place in Massachusetts, the situs of the Defendant Law Firm and its individual members. Further, Defendants are admitted to practice law in Massachusetts only and thus the state of Massachusetts has a significant interest in this matter.

(Defs. Mem. at 21-22). Plaintiffs counter that it is not where the alleged physical wrongdoing occurred, (here, Massachusetts), but where the plaintiff suffered the injury as a result of the wrongdoing. Because Plaintiffs suffered the alleged financial losses in South Carolina, they argue, South Carolina law must apply. The court agrees. While it may be true that the majority of the legal work occurred in Massachusetts, Plaintiffs were South Carolina residents at all relevant times, and any injuries suffered were incurred in South Carolina. *Cf. Castelli v. Steele,* 700 F.Supp. 449, 453 n.3 (S.D. Ind. 1988) (noting that "in medical and legal malpractice actions it is often necessary to look to the place of injury rather than just the tortious conduct, for the injury (and liability therefor) often does not accrue until well after the negligent activity has ceased."). Accordingly, South Carolina law applies. *See, e.g., Lister,* 494 S.E. 2d at 455. ("Since the Listers suffered their financial loss as a result of this misrepresentation in South Carolina, we conclude South Carolina law applies under the choice of law test for torts."); *see also Ackerman v. Schwartz,* 733 F.Supp, 1231, 1240-41 (N.D. Ind. 1989).[15]

---

[15] The court also must consider whether the applicability of South Carolina's substantive law violates due process under the facts of this particular case. *See Allstate Ins. Co. v. Hague,* 449 U.S.

### B.    The Statute of Limitations and the Discovery Rule

Because South Carolina is the forum where this lawsuit is proceeding, South Carolina's procedural rules govern. *See Thornton,* 886 F.2d at 87 ("Under South Carolina law when an action is brought in one jurisdiction for a tort which caused injury in another jurisdiction, . . . procedural matters [are determined] by the law of the forum.").  Statutes of limitations are procedural matters, and thus, the court applies South Carolina's statute of limitations to the matter *sub judice*.  *See Collins v. R.J. Reynolds Tobacco Co.*, 901 F.Supp. 1038, 1045 (D.S.C. 1995)("Since statutes of limitation are traditionally viewed as procedural in nature, the South Carolina statute of limitations applies to plaintiff's survival action.").

The parties agree that, under South Carolina law, a three year statute of limitations applies to all but Plaintiffs' civil RICO claim.[16]  *See* S.C. Code Ann. § 15-3-530 (providing a three year statute of limitations for professional negligence, breach of contract,[17] fraud, negligent misrepresentation, and breach of fiduciary duty); S.C. Code Ann. § 39-5-150 (providing a three year statute of limitations for SCUTPA claims).  The parties dispute, however, the application of South Carolina's so-called "discovery rule" to the facts at hand.

---

302, 308 (1981).  Given that the court has concluded that the exercise of personal jurisdiction does not violate due process above, the court similarly concludes, for the same reasons, that the application of South Carolina law is not constitutionally-problematic.

[16]  Plaintiffs' RICO claim is governed by a four year statute of limitations.  *See Potomac Electric Power Co. v. Electric Motor & Supply,* 262 F.3d 260 (4th Cir. 2001).

[17]  While Plaintiffs have stated a claim for breach of the implied covenant of good faith and fair dealing in addition to their breach of contract claim, this claim is "subsumed under the claim for breach of contract."  *RoTec Servs., Inc. v. Encompass Servs., Inc.,* 597 S.E. 2d 881, 883 (S.C. Ct. App. 2004).

14

Pursuant to the discovery rule, each of Plaintiffs' causes of action aside from the RICO claim must have been commenced within three years after Plaintiffs "knew or by the exercise of reasonable diligence should have known that [they] had a cause of action." *See* S.C. Code Ann. § 15-3-530 and 15-3-535; *see also Omni Outdoor Advertising v. Columbia Outdoor Advertising,* 974 F.2d 502 (4th Cir. 1992). "The exercise of reasonable diligence means simply that an injured party must act with some promptness where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist." *Wiggins v. Edwards,* 442 S.E. 2d 169, 170 (1994) (internal quotations omitted.); *see also Rumpf v. Massachussetts Mutual Life Ins. Co.,* 593 S.E. 2d 183, 187 (S.C. Ct. App. 2004) ("Reasonable diligence is intrinsically tied to the issue of notice."). Importantly, "[t]he statute of limitations begins to run from this point and not when advice of counsel is sought or a full-blown theory of recovery developed." *Id.*

The date on which discovery of the cause of action should have been made is an objective, rather than a subjective, question. *See Joubert v. South Carolina Dep't of Soc. Servs.,* 534 S.E.2d 1 (S.C. Ct. App. 2000); *see also Moriarty v. Garden Sanctuary Church of God,* 534 S.E. 2d 672, 678 (S.C. 2000)("The rule . . . is not whether [Plaintiff] herself was on notice by a certain date (a subjective standard), but whether a reasonable person in her circumstances would have been on notice by a certain date (an objective standard)."); *Young v. South Carolina Dept. of Corrections,* 511 S.E.2d 413, 416 (S.C. Ct. App. 1999).

Application of the discovery rule in the present matter hinges on when a reasonable person would have been on notice that a possible wrong had been committed in Defendants' assistance of Post in connection with the Rhode Island property. Plaintiffs contend that the discovery rule does

15

not bar their claims because the fact that Post decided to purchase the property alone, or even that Defendants provided some assistance to him, did not put KCI or Kisteneff on inquiry notice of the wrong of which they complain in this litigation:

> That Post, after Plaintiffs believed the original deal for KCI's purchase of the Rhode Island property was unenforceable and no longer in play, sought separately and individually to purchase the property does not give rise to any knowledge or even suspicion of wrongdoing. Nor did Plaintiffs' knowledge that the Defendants lawyers and law firm may have been called upon by Post - separate and apart from the original option by KCI to purchase the relevant land - to assist with that purchase. Instead, Plaintiffs contend that the information that would have put Plaintiffs on inquiry notice and triggered the running of the applicable statutes of limitation was knowledge that Plaintiffs' own real estate deal, which Defendants had informed Plaintiffs was unenforceable, had itself been converted to Post's use with the help of Defendants.

(Pl. Resp. at 18-19).[18] According to Plaintiffs, it was not until documents were produced on April 14, 2000 in related pending litigation between Post and Plaintiffs that Plaintiffs learned "that the actual sale of the Rhode Island property to Post was a continuation and conversion of the original deal between the owner of the Rhode Island property, Gary Malloy, and Plaintiff KCI . . . ." (Pl. Resp. at 18).

As a threshold matter, Plaintiffs' arguments misapprehend the discovery rule test, as Plaintiffs focus on what they subjectively knew at what points in time, rather than on whether an objectively reasonable person would have been put on notice of potential claims. *See, e.g.,*

---

[18] Plaintiffs have not pled a cause of action for conversion, and thus the court need not consider this seemingly new theory of recovery. Moreover, the fact that Plaintiffs attempt to now categorize their claim as one for conversion does not change the court's conclusions with respect to when Plaintiffs were put on inquiry notice that they might have a claim against Defendants. *See, e.g., Epstein,* 610 S.E. 2d at 818 (noting that the statute starts to run when the plaintiffs learn that some claim might exist, "not when advice of counsel is sought or a full-blown theory of recovery developed.").

*Moriarty,* 534 S.E. 2d at 678.  While Plaintiffs correctly point out that in South Carolina the question of when a plaintiff may be on notice of a claim is one for the jury when there is conflicting evidence, the court find that there is no conflicting evidence here.  *See, e.g., Arant v. Kressler,* 489 S.E. 2d 206, 208 (1997) (recognizing that if testimony conflicts regarding the date of discovery of a cause of action, it is a question for the jury, but when there is not a conflict in the facts, summary judgment is appropriate); *Dean v. Ruscon Corp.,* 468 S.E.2d at 648 ("there was no question of fact for the jury to decide because the only reasonable conclusion supported by the evidence is that Dean's lawsuit accrued in November 1984, and by filing her lawsuit in April 1991, she was barred by the six year statute of limitations"); *Perry Eng'g Co. v. AT & T Communications, Inc.,* 1993 WL 264461, at *5 (4th Cir. July 13, 1993) ("issues such as reasonableness and negligence normally reserved to a jury may be resolved as a matter of law where only one conclusion may reasonably be drawn from the evidence").  The facts, even taken in the light most favorable to Plaintiffs, suggest that a reasonably diligent person would have been put on notice that a cause of action potentially lay against Defendants as early as 1997 and 1999.

First, it is undisputed that in March of 1997, Post told Kisteneff[19] that he intended to pursue the Rhode Island transaction on his own, without KCI's involvement.  (Kisteneff '04 Dep. at 200, 201).  Kisteneff and KCI took no action in response to this information.  *Id.*  Kisteneff additionally admits that he knew that Post and Saltiel had been friends since childhood, and had pursued joint ventures as co-general partners on a number of prior real estate ventures.  (Kisteneff Aff. ¶ 4.2).  Kisteneff unquestionably knew that the Law Firm was representing Post's interests in the formation

---

[19]  The court finds that Kisteneff and KCI are interchangeable for purposes of determining the knowledge of either, as Kisteneff is the founder and president of KCI.  (Kisteneff Aff. ¶ 1.2).

of ALMA.  (Kisteneff Aff. ¶ 10.4-10.8).  Even more tellingly, in September of 1997, Kisteneff

expressly repudiated a bill from the Law Firm that billed him for services related to the Rhode Island

property.  See Def. Ex. 49, Letter from Kisteneff to Saltiel of September 4, 1997 ("With respect to

the Statement of Account you sent me on August 20, 1997, you may recall that services rendered

for matters identified as . . . Cranston, R.I. . . . were not commissioned by me, nor were they

performed for my benefit.").  Given these facts, a reasonable person would have certainly been on

inquiry notice that the Law Firm could have been operating under a conflict of interest in

representing Post in matters potentially adverse to Kisteneff and KCI's interest.

　　　　While the aforementioned facts put Kisteneff on inquiry notice of the Law Firm's potential

involvement in the Rhode Island transaction, Kisteneff additionally garnered actual notice of the

firm's involvement in 1999.  In June of 1999, in the related litigation between Post and

Kisteneff/KCI, KCI's counsel deposed Post, who testified that he and the Rothsteins, with the Law

Firm's assistance, had purchased and were developing the Rhode Island property.  (Post Dep. at 133-

134).  Second, on October 15, 1999, Post's attorney sent documents to KCI's attorney which

revealed that the Law Firm had aided Post in purchasing the property.  (Def. Ex. 55).  Specifically,

these documents included letters from Saltiel to Post and the Rothsteins in which the firm sought

signatures from the parties to effectuate the development of an entity, New Frontier Development,

LLC, which would be responsible for the Rhode Island development.  Id.  Most damaging to

Kisteneff's argument that he did not know of the Law Firm's involvement until April of 2000 is a

letter his counsel sent to Post's counsel on October 22, 1999.  In that letter, in regards to information

he was attempting to discover, Post's counsel writes

　　　　I agreed to accept abbreviated documents, including the controlling document, which

18

detailed the Post/Rothstein business arrangement for a real estate development in Cranston, Rhode Island ("the Cranston project"). It was our understanding that you would thereby afford me a fair and accurate, albeit abbreviated, portrayal of the genesis and of the operation of the Cranston Project. You advised me, that if Mr. Post could not locate sufficiently informative documents, that you would secure documents from the Posternak law firm ("Posternak"). Unilaterally, . . . you faxed me letters from the files of Posternak, which purported to moot my client's justifiable suspicion that Mr. Post diverted the Cranston Porject from my client to the Post/Rothstein business partnership. . . . Additionally, in your cover letter which accompanied the letters from the Posternak files, you asserted that Posternak could not locate any other materials, in connection with the Post/Rothstein business arrangement, which was handled by Posternak.

(Defs. Ex. 57). KCI received further information confirming the Law Firm's involvement in the Post/Rothstein purchase on November 11, 1999. (Def. Ex. 56).

In *Dean v. Ruscon Corp.*, 468 S.E. 2d 645, 647 (S.C. 1996), the South Carolina Supreme Court explained the nature of "reasonable diligence" in discovering the existence of a potential claim:

[w]e have interpreted the exercise of reasonable diligence to mean that the injured party must act with some promptness where the facts and circumstances of an injury place a reasonable person of common knowledge and experience on notice that a claim against another party might exist.

*Id.* In the court's opinion, Kisteneff's knowledge regarding Post's pursuit of the Rhode Island property with the Law Firm's assistance (in 1997 and definitively in 1999) would have put a reasonably diligent person on notice that a claim against the Law Firm could exist stemming from a conflict of interest. Moreover, Kisteneff is a sophisticated business person who has been involved in numerous legal transactions and lawsuits, and thus had even more of a basis to know of a potential claim than a person of common knowledge and experience. In short, the record contains ample undisputed evidence demonstrating that Kisteneff should have investigated potential claims against

the Law Firm in September of 1997, when he received a bill from the Law Firm containing charges related to the Rhode Island property and repudiated that bill, and certainly in 1999, when his attorney was actually told that the Law Firm was representing Post and the Rothsteins.  *See, e.g., Ashley River Indust., Inc. v. Mobil Oil Corp.,* 135 F.Supp. (D.S.C. 2000) ("The plaintiffs were under an obligation to make a reasonable inquiry into the matter, which they did not make."). Accordingly, Kisteneff had inquiry notice in 1997, and had actual knowledge in 1999.  Because Plaintiffs failed to file suit until April 9, 2003, well over three or four years after they were on inquiry notice that "some claim" against these Defendants "might exist", *see Epstein v. Brown,* 610 S.E. 2d 816, 818 (S.C. 2005), Plaintiffs allowed the statute of limitations to expire on all causes of action.[20]  *See, e.g.*, *Hernandez v. Caldwell*, 225 F.3d 435, 439 (4th Cir. 2000) ("When a statute of limitations is measured in years, the last day for instituting the action is the anniversary date of the start of the limitations period." (internal quotation marks omitted)).  Given that Plaintiffs' claims are all barred by the relevant statutes of limitation, the court grants Defendants' motion for summary judgment.[21]

## CONCLUSION

---

[20]  Pursuant to RICO, Plaintiffs had four years to file their cause of action.  *See Rotella v. Wood,* 528 U.S. 549 (2000).  As with the common law and SCUTPA causes of action, the statute of limitations on private RICO claims begins to run when the plaintiff discovered, or should have discovered, the injury.  *See Potomac Elec. Power Co. v. Electric Motor & Supply,* 262 F.3d 260 (4th Cir. 2001).  Plaintiffs' purported RICO injury is not being included in the development of the Rhode Island property.  Because the court concludes that Plaintiffs were on at least inquiry notice of the Law Firm's representation of Post in this matter in 1997, Plaintiffs' RICO claim is similarly time-barred.

[21]  The court need not address the remaining grounds Defendants raise in support of summary judgment.  Likewise, Defendants' motion seeking to strike certain of plaintiff's experts and testimony is rendered moot.

It is therefore **ORDERED,** for the foregoing reasons, that Defendants' Motion to Dismiss or Alternatively for Summary Judgment is **GRANTED in PART and DENIED in PART.**  The court **DENIES** Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2), and **GRANTS** Defendants' Motion for Summary Judgment on all of Plaintiffs' causes of action.

It is further **ORDERED** that Defendants' Motion to Strike And/Or Exclude is hereby rendered **MOOT.**

**AND IT IS SO ORDERED.**

**s/ Patrick Michael Duffy**
**PATRICK MICHAEL DUFFY**
**UNITED STATES DISTRICT JUDGE**

**Charleston, South Carolina**
**August 8, 2005**